Noto.’, Ch. J.,
delivered the opinion of the court:
In May, 1877, the Northern Cheyennes numbered about'!,800 persons. They had borne a distinguished part in the Sioux war of 1876, but had surrendered and made peace with the United States, and were then indeed acting as scouts and soldiers for the Government. In that month 937 were taken to the Indian Territory. The body was said to be composed of Dull Knife’s band, of Wild Hog’s, of Old Crow’s, and of Little Wolf’s. The so-called bands were not then bands in a tribal, political, or military sense, but simply parties who lived, as it were, in separate hamlets on the reservation; and the so-called chiefs were without authority, chiefs who could not make war or conclude peace or enter into treaty stipulations, but simply headmen, leaders, or spokesmen.
During the previous autumn all of the Northern Cheyennes who had been in arms with Sitting Bull had come in and surrendered except Dull Knife’s band.
• On the 25th of November, 1876, Colonel Mackenzie had struck the village of Dull Knife with a column led by Indian scouts, many of whom were Cheyennes. The Indians were surprised, and fled among the rocks with nothing but their arms and ammunition and the clothes they wore. The weather was so intensely cold that on the nights of the 25th and 26th fourteen Indian babies were frozen to death in their mothers’ arms. Dull Knife and his band made their way to the camp of Crazy Horse, who received them so coldly that they were deeply incensed, and came in and surrendered and turned against Crazy Horse and the remnaut of the Ogalallas who were still hostile. During the ensuing winter friendly relations were cultivated by the officers who had fought them. Captain Bourke writes:
“One day when the Cheyenne chief Dull Knife was at headquarters, I invited him to stay for luncheon.
*321 “ ‘ I should be glad to do so ’ he replied, £ but my daughters are with me.’
“ ‘ Bring them in, too,’ was the reply from others of the mess, and Spotted Tail, who was present, seconded our solicitations ; so we had the pleasure of the company, not only of old Dull Knife, whose lite had been one of such bitterness and sorrow, but of bis three daughters as well. They were fairly good-looking — the Cheyennes will compare favorably in appearance with any people I have seen — and were quite young; one of 9 or 10, one of 12, and the oldest not yet 20, a young widow.
“ Of the other Cheyennes, there was Little-Wolf, one of the bravest in fights where all were brave.”
This was the condition of Dull Knife’s, band when the removal to the Indian Territory took place. It had been on the warpath, acting independently of the other members oí the tribe, but at the time was merged in the mass of Northern Cheyennes on the reservation, and was with all the others there in amity.
After a year of sickness, misery, and bitterness in the Indian Territory, and repeated prayers to be taken back to the country where their children could live, 320 of them, in September, 1878, broke away from the reservation. Dull Knife and Little Wolf were the leaders of this escaping party, which consisted of their bands.
They were pursued and overtaken. A parley ensued in which Little Wolf, whom Captain Bourke characterizes as “one of the bravest in fights where all were brave,” said, “ We do not want to fight you, but we will not go back.” The troops instantly fired upon the Cheyennes and a new Indian war began.
That volley was one of the many mistakes, military and civil, which have been the fatality of our Indian administration, for the officer who ordered it thereby instituted an Indian war, and at the same instant turned hostile savages loose upon the unprotected homes of the frontier and their unwarned, unsuspecting inmates. The Cheyennes outgeneraled the troops. They fought and fled, and scattered and reunited. They fought other military commands and citizens who had organized to oppose them, and in like manner they again and again eluded their opponents, making their way northward over innumerable hindrances. They had not sought war, but from the moment when they were fired upon they were upon the warpath — ■ men were killed, women were ravished, houses were burned, *322 crops destroyed. The country, through which they fled and fought was desolated, and they left behind them the usual well-known trail of fire and blood.
At length, on the 3d of October, 1878, in northern Nebraska, the Cheyennes were brought to bay by troops who intercepted and fought them. They surrendered and were carried as prisoners of war to Fort Eobinson, numbering then 49 men, 51 women, and 48 children. The war had ended, but the Cheyennes were able to console themselves with the reflection that the officer who began the war had not been able to carry them back to the reservation; that they had killed Lieutenant-Colonel Lewis, 5 soldiers, and 26 settlers, and that the wives and children of their enemies had suffered more bitterly than their own.
But here a new element comes into the case. Shortly before or after the depredations were committed which are the subject of the present action, but before the final capture of the Indians above referred to, Little Wolf and his band separated from the others and turned into the mountains. They disappeared then and as a band have never been seen since. Whether they perished during the ensuing winter or made their way northward and merged with other Indians is conjectural. Only 30 are known to have reached the Cheyenne Eeservation on the Bose-bud. Dull Knife and his band were carried to Fort Eobinson. There they persistently refused to return to the reservation and were kept in close custody. In January, 1879, orders from the Interior Department arrived at Fort Eobinson peremptorily directing the commanding officer to remove them to the reservation. On the 3d of January, 1879, the Indians were told of this, and on the next day gave, through Wild Hog, their spokesman, their unequivocal answer, “We will die, but we will not go back.”
The commanding officer apparently shrunk from shooting them down; removing them meant nothing short of that, or of actually carrying each one forcibly to the detested place from which they had escaped. The military authorities therefore resorted to the means for subduing the Cheyennes by which a former generation of animal tamers subdued wild beasts. In the midst of the dreadful winter, with the thermometer 40° below zero, the Indians, including the women and children, were kept for five days and nights without food or fuel, and for three days without water. At the end of that time they broke out of the barracks in which they were confined and rushed *323 forth into the night. The troops pursued, firing upon them as upon enemies in war; those who escaped the sword perished in the storm. Twelve days later the pursuing cavalry came upon the remnant of the band in a ravine 50 miles from Fort Eobinson. “The troops encircled the Indians, leaving no possible avenue of escape.” The Indians fired on them, killing a lieutenant and two privates. The troops advanced; “the Indians, then without ammunition, rushed in desperation toward the troops with their hunting knives in hand; but before they had advanced many paces a volley was discharged by the troops and all was over.” “The bodies of 24 Indians were found in the ravine — 17 bucks, 5 squaws, and 2 papooses.” Nine prisoners were taken — 1 wounded man, and 8 women, 5 of whom were wounded. The officer in command unconsciously wrote the epitaph of the slain in his dispatch announcing the result: “The Cheyennes fought with extraordinary courage and firmness, and refused all terms but death.” The final result of the last Cheyenne war was, that of the 320 who broke away in September, 7 wounded Cheyennes were sent back to the reservation.
This statement illustrates the extraordinary difficulties which the court has had to encounter in dealing with these Indian depredation cases. The United States are liable only as guarantors where the Indians are known, and there must primarily be a judgment against such Indian defendants which the United States undertake to pay if it can not be collected from the Indian judgment debtors. In this case, if these bands of Dull Knife and Little Wolf are to be regarded as responsible entities and as the proper Indian defendants against whom a judgment should be rendered, and this were an ordinary suit at law, there would really be no defendant before the court, for these bands had utterly ceased to exist before the suit was brought.
These Indians, indeed, in 1878 occupied an anomalous position, unknown to the common or the civil law or to any system of municipal law. They were neither citizens nor aliens; they were neither free persons nor slaves; they were the wards of the nation, and yet, on a reservation under a military guard, were little else than prisoners of war while war did not exist. Dull Knife and his daughters could be invited- guests at the table of officers and gentlemen, behaving with dignity and propriety, and yet could be confined for life on a reservation *324 wbicb was to them little better than, a dungeon, on the mere order of an executive officer.
It has been argued in this case with great earnestness that these Cheyennes had a lawful right to leave the reservation and travel peaceably back to their old homes; that they did not begin the conflict, and merely resisted force by force; that their acts were lawful and the action of the pursuing troops unlawful. But it is impossible to define their status from a legal point of view. Whether they could have sued out writs of habeas corpus and been set free by judicial authority is not for this court now to decide. For the purposes of the jurisdictional statute it is enough to say that after they were first fired upon they were not in amity. If their action was lawful and the acts of the military were unlawful, those circumstances make the cause of war more justifiable and pronounced.
It has also been urged that certain appropriations made by Congress granting relief to some of the victims of these depredations committed by Dull Knife’s band, and directing that the payments be charged to and deducted from moneys which might otherwise be paid to the “Northern Cheyenne and Arapahoe Indians,” is a legislative recognition of the then existing unity of the 'Northern Cheyenne tribe and of Dull Knife’s band as individuals of the tribe. But Congress have, by the subsequent jurisdictional act, authorized the Northern Cheyennes to come into this court and have their rights and liabilities judicially determined. A primary question in their case is whether they were legally responsible for the acts of certain hostile Indians. That question is a judicial question, and consequently one which the court must decide irrespective of legislative action. The recognition of bands and tribes by the political branches of the Government must be contemporaneous. The legislative action above referred to was ex post facto. Acts 17th May, 1882, and 4th July, 1884 (22 Stat. L., p. 86; 23 id., 95). Congress, with such light upon the case as then existed, endeavored to do justice in the premises; but the subsequent statute, the jurisdictional act, has transferred that duty to the judiciary.
The court regards these two bands as having been Indian entities and proper defendants in these cases within the intent of the decisions in Montoya v. The Mescalero Apaches (32 C. Cls. R., 249) and Herring v. The Ute Indians (ib., 536). The bands of Little Wolf and Dull Knife were not so large, and the *325 objects for which they existed were not so well defined as those of Victoria and Black Hawk, but nevertheless were operating as independent bodies, distinct from and irrespective of all other Indians. Moreover, their acts were acts of war. It was not the case of individual Indians wandering from the main body, murdering and destroying, while the main body remained in amity with the United States, but it was the case of an entire body waging armed resistance with all its might and with all the ferocity of Indian warfare against whatever power the United States could bring to bear upon them. The fearful extermination of Dull Knife’s band by the responsible military authority of the United States on the assumption that they were escaping prisoners of war refutes the idea of a preexisting condition of amity and renders it preposterous.
In 1878 the Northern Cheyennes no longer existed as an entire body or as a responsible tribe. Half of them had been carried south to the Indian Territory and half westward to the head waters of the Bosebud, and these two bands, headed by Little Wolf and Dull Knife, after they broke away from the reservation, belonged to neither half. The Cheyennes who remained in the Indian Territory could exercise no control over them; the Cheyennes on the Bosebud had been permanently separated from them. To hold these warring elements of an Indian band, which were then isolated and in active hostility, as nothing more than a number of individual Indians not at war but engaged in personal plunder while their tribe remained in peace would be to defeat the purpose of all and each of the Indian indemnity acts. It is indeed most unfortunate that the unhappy frontiersmen must suffer without remedy where the atrocities were greatest, while others can recover in other cases where the wrong done them was less; but nevertheless it must be held that if officers or agents or citizens of the United States drive a tribe or band of Indians into a state of war the tribe or band can not be held liable for the obligations which would rest upon them if they were enjoying the blessings of peace and remaining in amity with the United States; and it must likewise be held that where the United States engage in war with a distinct portion of a tribe, acting independently of the tribe, over which the tribe can exercise no control, being in fact a distinct military command, the tribe in amity can not be held responsible for the acts of the hostile Indians.
*326 Tbe judgment of tbe court is that tbe petition against tbe United States and tbe Cheyenne tribe be dismissed; and that tbe petition against tbe United States and Dull Knife’s band and Little Wolf’s band be dismissed for want of jurisdiction.